IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| PINE CREEK MEDICAL CENTER, LLC, | § | |
| | § | CASE NO. 19-33079-11 |
| Debtor. | § | |
| | § | |

### DECLARATION OF MARK SHAPIRO IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Mark Shapiro declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following is true and correct:

1. My name is Mark Shapiro and I am of sound mind and capable of making this Declaration. I have personal knowledge of the facts stated herein and they are true and correct.

2. I am the Chief Restructuring Officer of Debtor Pine Creek Medical Center, LLC (the "Debtor" or "Pine Creek"). In this capacity, I am generally familiar with the Debtor's operations, businesses, financial affairs, and books and records.

1. On September 13, 2019, the Debtor voluntarily commenced this case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or creditors committee has been appointed in the Chapter 11 Case.

2. I submit this declaration (the "First Day Declaration") to provide an overview of the Debtor and the Chapter 11 Case and to supplement the Debtor's chapter 11 petition and "first day" motions and applications (each, a "First Day Motion," and collectively, the "First Day Motions"). Except as otherwise indicated herein, all facts set forth in this First Day

Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management teams or the Debtor's advisors, and/or my opinion based upon my knowledge and experience and information I have reviewed concerning the Debtor's operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtor and, if called upon to testify, I could and would testify competently to the facts set forth herein.

3. The purpose of this First Day Declaration is to familiarize the Court with the Debtor and the relief it seeks in the First Day Motions. To that end, this First Day Declaration is organized as follows:

## I. THE DEBTOR'S BUSINESS AND EVENTS LEADING TO BANKRUPTCY

4. The Debtor, a Texas limited liability company, formed in December 2011 by the conversion of Pine Creek Medical Center, LLP, a Texas limited liability partnership formed in April 2003. The Debtor is a privately-owned Dallas, Texas-based single location physician owned surgical hospital that provided inpatient, outpatient, emergency, and other ancillary services from its location at 9032 Harry Hines Boulevard, Dallas, Texas 75235.

5. Prior to the Petition Date, the Debtor's business model was negatively impacted by the effects of the Patient Protection and Affordable Care Act,[1] macro-economic changes in the medical industry, various lawsuits, and a large debt obligation arising from settlement of alleged violations of the Stark Law and Anti-Kickback Statute.[2] With revenues declining and liabilities increasing, the Debtor's net operating losses, totaling $4.8 million for the year through April 2019, could not continue unabated.

---

[1] 42 U.S.C. § 18001, *et seq.*

[2] 42 U.S.C. §§ 1320a-7b, 1395nn.

6. On April 29, 2019, the Debtor ceased admitting new patients, and the following month, the Debtor's Board of Directors appointed me as Chief Restructuring Officer with the directive of winding down the Debtor's operations and procuring a purchaser of the Debtor's remaining assets or operations as a going concern. Despite receiving serious consideration from two potential purchasers, the sale process was unsuccessful.

7. As of the Petition Date, the Debtor had ceased providing medical services, released or transferred all of its patients to other medical centers, and terminated all but three of its employees. The majority of its accounts receivables and medical equipment has been sold.

8. The Debtor intends to use the breathing spell provided by the filing of this bankruptcy case to monetize its remaining assets and to provide for the orderly liquidation of claims against the Debtor's bankruptcy estate. The Debtor intends to file a plan of liquidation that provides the maximum recovery for Debtor's creditors and avoids further deterioration of Debtor's assets through unsustainable operating losses.

9. The Debtor no longer operates its facility as a hospital that regularly serves patients and is no longer engaged in routine patient care.

## II. FIRST DAY MOTIONS

10. The Debtor has filed a number of First Day Motions. I believe that, among other things, the relief requested in the First Day Motions is necessary to enable the Debtor to continue with minimal disruption during the pendency of this Chapter 11 Case, thereby preserving and maximizing the value of the Debtor's estate. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below. I have reviewed each of the First Day Motions, and the facts set forth therein are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

A.  **First Omnibus Motion for Entry of an Order Authorizing the Debtor to (I) Assume Executory Contract, (II) Reject One Unexpired Lease of Nonresidential Real Property and Executory Contracts as of the Petition Date, (III) Abandon Property of the Estate, and (IV) Granting Other Related Relief.**

11. Pursuant to sections 105(a), 365, and 554 of the Bankruptcy Code, the Debtor seeks (i) authority to assume the contract set forth in Schedule 1 to Exhibit A to the motion (the "Assumed Contract"), (ii) authority to reject, as of the Petition Date, the lease (the "Rejected Lease") and contracts (the "Rejected Contracts") set forth in Schedule 2 to Exhibit A to the motion, (iii) authority to abandon all personal property of de minimis value that remains at the leased premises (the "Leased Premises"), and (iv) related relief.

12. In the Debtor's business judgment, assumption of the Assumed Contract is in the best interest of the Debtor's estate and its creditors and should be authorized by this Court.

13. Furthermore, in the Debtor's business judgment, rejection of the Rejected Lease and Rejected Contracts and abandonment of personal property of de minimis value remaining at the Leased Premises is in the best interest of the Debtor's estate and its creditors and should be authorized by this Court.

   i.  **The Assumed Contract.**

14. Prior to the Petition Date, the Debtor's Board of Directors appointed me to the position of Chief Restructuring Officer. The Assumed Contract listed in Schedule 1 represents the contract between the Debtor and GlassRatner Advisory & Capital Group LLC pursuant to which the Debtor employs me.

15. The Debtor's continued employment of me as Chief Restructuring Officer is in the best interest of the Debtor's estate because I am the most knowledgeable individual with respect to the Debtor's business operations and the remaining assets that remain to be liquidated..

  **ii.** **The Rejected Lease and Contracts.**

16. The Rejected Lease listed in Schedule 2 consists of one non-residential real property lease for the Leased Premises located at 9032 Harry Hines Boulevard, Dallas, Texas 75235. The Rejected Contracts listed in Schedule 2 consist of various medical equipment leases of personal property located on the Leased Premises and one accounts receivable factoring agreement.

17. Rejection of the non-residential real property lease and the executory contracts identified in Schedule 2 are in the best interest of the Debtor's estate because the Debtor is no longer operating and is no longer in need of the leases and contracts identified in Schedule 2.

**B.** **Motion for an Order Authorizing the Debtor to Dispose of Patient Records.**

18. In the ordinary course of its operating business, the Debtor collected and maintained patient records, which include private health and financial information. All patient records, including private or confidential medical and financial information, collected and maintained in connection with the Debtor's operations are the "<u>Patient Records</u>."

19. State and federal law requires the Debtor to maintain the Patient Records for as long as 10 years after death or discharge. *See* Tex. Health & Safety Code § 241.103(a) & (b); 25 Tex. Admin. Code § 133.41(j)(8); 42 CFR 422.504 (Medicare Conditions of Participation); and 42 CFR 422.504 [d][2][iii] (Medicare Managed Care requirements).

20. Section 351 of the Bankruptcy Code authorizes the Debtor to destroy the Patient Records in the event the Debtor does not have sufficient funds to pay for the storage of those records in the manner required under applicable federal or state law.

21. If the Debtor does not obtain relief under Section 351 of the Bankruptcy Code, it will be subject to substantial state and federal patient records retention and custodial requirements.

22. The Debtor has communicated with third-party providers to ascertain the costs and logistics associated with the storage of the Patient Records. The Debtor believes that the continued storage and maintenance of the Patient Records would collectively cost approximately $92,748.00 for one year, or $927,480.00 for ten years. Because the Debtor is operating under severe financial distress and has limited working capital, and because substantially all of the Debtor's assets have been liquidated prior to the filing of this Chapter 11 case, the Debtor believes that the continued maintenance and retention of the Patient Records by the Debtor's estate for the entire ten (10) year period is not in the best interest of the Debtor, its bankruptcy estate, or its creditors.

23. The Debtor intends to substantially comply with the requirements of Section 351 of the Bankruptcy Code regarding the procedure for providing notice regarding the intention to dispose of the Patient Records. Specifically, the Debtor, or its agents, intend to:

(a) Publish notice (the "Notice") in one or more appropriate newspapers that if the Patient Records are not claimed by the patient or an insurance provider within 365 days after the publication of the Notice, that the Debtor, or an agent of the Debtor, will destroy the Patient Records. *See* 11 U.S.C. § 351(1)(A).

(b) Within 180 days of the publication of the Notice, attempt to notify each patient directly that is the subject of the Patient Records and the appropriate insurance carrier concerning the Patient Records by mailing to

the most recent known address of that patient, or a family member or contact person for that patient, and to the appropriate insurance carrier an appropriate notice regarding the claiming or disposing of the Patient Records. *See* 11 U.S.C. § 351(1)(B).

(c) For any records that have not been claimed within the 365 days after the publication of the Notice, mail, by certified mail, a written request to each appropriate Federal agency to request permission from that agency to deposit the patient records with that agency. *See* 11 U.S.C. § 351(2).

24. The Debtor intends to comply with the disposal requirements mandated by Section 351 of the Bankruptcy Code for all patients for which they have accessible contact information. Specifically, for any records that have not been claimed after providing the above notices, the Debtor shall shred or burn any written Patient Records and, for any records that are magnetic, optical, or electronic, destroy such records so that the records cannot be retrieved. *See* 11 U.S.C. § 351(2).

C. **Motion for Determination that Section 333 is not Applicable in this Case or, in the Alternative, Appointment of a Patient Care Ombudsman is not Necessary.**

25. The Debtor requests that this Court determine that the appointment of a patient care ombudsman under 11 U.S.C. § 333 is not needed because the Debtor is not a "health care business" for the purposes of 11 U.S.C. § 333 or, in the alternative, because of the particular facts and circumstances of this case.

26. The Debtor is not primarily engaged in offering to the general public facilities and services, because the Debtor is not currently engaged in offering anything to the general public related to health care facilities and services.

27. Accordingly, the Debtor believes that Section 333 does not apply and the appointment of an ombudsman is not required in this case.

28. Alternatively, there are substantial reasons why the appointment of a patient care ombudsman is not warranted in this case. As noted above, the Debtor's bankruptcy filing has been wholly driven by ordinary debt issues. None of the debt issues which have precipitated this bankruptcy filing relate to "patient care" issues.

29. The Debtor is subject to limited state or federal monitoring or regulation due to it no longer providing patient care. The Debtor is not engaged in any kind of patient care. Although, the Debtor previously engaged in patient care, the Debtor is no longer engaged in patient care and its past care is irrelevant to the present case. Lastly, the appointment of a patient care ombudsman would be a solution in search of a problem.

30. Given the absence of patient care in the Debtor's operation of the wind-up of its businesses, it is unclear that an ombudsman would actually have anything to do, other than increase costs of the bankruptcy unnecessarily. All factors weigh against the appointment of a patient care ombudsman, and the Debtor requests that the Court find that such an appointment is not necessary.

**D. Motion Seeking Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Providing Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing.**

31. Effective as of June 14, 2018, the Debtor entered into Commercial Loan Agreement with CrossFirst Bank, as lender ("Pre-Petition Lender"), for a term loan, as well as a Revolving Line of Credit Agreement (as amended or modified and collectively, the "Financial Accommodations") in the aggregate principal amount of $5,400,000.00. The total amount owed under the Financial Accommodations as of the Petition Date is $375,312.35.

32. To secure the obligations under the Financial Accommodations, the Debtor has executed that certain Security Agreement ("Security Agreement") in favor of Pre-Petition Lender granting Pre-Petition Lender a purported lien on substantially all of the Debtor's assets, including deposit accounts, accounts receivable, furniture, fixtures, and equipment.

33. The Financial Accommodations provided the Debtor with capital needed to, among other things, refinance existing non-residential debt and fund the Debtor's operations.

34. To date, there are no monetary defaults under the Financial Accommodations.

35. As of the date hereof, pending a full analysis and review by the Debtor's professionals, an initial review of the Financial Accommodations and other relevant documents indicates that Pre-Petition Lender holds a first priority lien in all off the Debtor's assets securing repayment of the Financial Accommodations.

36. The Pre-Petition Lender is substantially oversecured, as the Debtor has an aggregate cash balance in excess of $2 million as of the Petition Date.

37. The Debtor has an urgent and immediate need for the use of Cash Collateral (as defined in the motion) for two reasons. First, the Debtor has not obtained post-petition financing, and the Debtor does not intend to do so. Without the Cash Collateral, the Debtor has no means to satisfy its ongoing expenses and wind down its business affairs. Second, and more importantly, the Debtor requires the Cash Collateral to properly preserve its patients' records. Without immediate access to Cash Collateral, the Debtor runs the risk of being incapable of satisfying its immediate obligations to ensure that its patients have access to their records and that such records are properly preserved for the requisite time period pursuant to applicable law.

38. The Pre-Petition Lender has the benefit of a substantial equity cushion in this bankruptcy case. The Pre-Petition Lender also will be adequately protected by a Replacement

Lien, the Adequate Protection Claim, and the Adequate Protection Payments (as defined in the motion) to avoid any risk in the diminution in the value of the pre-petition collateral.

E. **Application for an Order Authorizing the Retention of Husch Blackwell LLP as Counsel for the Debtor.**

39. The Debtor desires to employ the law firm Husch Blackwell LLP ("Husch Blackwell") to serve as its bankruptcy counsel in this case. Husch Blackwell has been selected by the Debtor because the firm has significant experience in bankruptcy matters and is well qualified to represent the Debtor. The Debtor and Husch Blackwell have selected Buffey Klein and Lynn Butler to serve as attorneys in charge with respect to Debtor's representation, with other attorneys and staff to perform services as needed.

40. Husch Blackwell received a retainer of $100,000 for services to be performed in connection with this case. Of that retainer, $38,179.00 was offset by the Firm immediately before filing of the Case.

41. No attorney fees and/or expenses will be paid from the remaining retainer funds until such payment is approved by the Bankruptcy Court.

### III. CONCLUSION

42. To minimize any loss of value to the Debtor's remaining assets, the Debtor's immediate objective is to continue its wind down efforts following the commencement of this Chapter 11 Case with as little interruption to the Debtor as possible. If the Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives–to the maximum benefit of the Debtor's estates, creditors and parties in interest–will be substantially enhanced. I

respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 13, 2019.

MARK SHAPIRO